UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JAMES L. EDWARDS, JR.,                                    :
                                                         :          22-CV-4345 (RWL)
                              Plaintiff,                  :
                                                         :
              - against -                                :          **DECISION AND ORDER:**
                                                         :          **SOCIAL SECURITY APPEAL**
                                                         :
COMMISSIONER OF THE SOCIAL                                :
SECURITY ADMINISTRATION,                                  :
                                                         :
                              Defendant.                  :
-------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:_____**
**DATE FILED:** 9/22/2023

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff James L. Edwards, Jr. ("Edwards"), represented by counsel, commenced the instant action against Defendant Commissioner (the "Commissioner") of the Social Security Administration (the "Administration"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Edwards is not entitled to disability insurance benefits ("DIB"). Edwards has moved for remand to the Social Security Administration for further proceedings. The Commissioner has cross-moved for judgment on the pleadings, asking the Court to affirm the Commissioner's decision. For the reasons explained below, the Court GRANTS the Commissioner's motion and DENIES Edwards' motion.

1

## PROCEDURAL HISTORY

On July 8, 2020,[1] Edwards filed an application for DIB for a period of disability beginning on June 5, 2019.  (R. 11, 269-74, 296-302.[2])  Edwards claimed disability due to personality disorder, anxiety disorder, adjustment disorder, neck injury, back injury, and high cholesterol.  (R. 297.)  The Administration initially denied Edwards' application on October 29, 2020 (R. 97) and upon reconsideration on March 26, 2021 (R. 117).  Edwards then requested a hearing before an administrative law judge ("ALJ") (R. 173-74), which was held on July 27, 2021 before ALJ Michael J. Stacchini (the "ALJ") (R. 55-84).  Edwards, represented by counsel, testified via telephone.  (R. 57-79.)  A vocational expert ("VE"), Marissa Howell, also appeared and testified.  (R. 79-83.)  On August 12, 2021, the ALJ issued a decision finding Edwards not disabled and capable of performing work that exists in significant numbers in the national economy.  (R. 8-29.)

After the ALJ's denial of his claim, Edwards requested review by the Appeals Council of the ALJ's decision.  (R. 248-50.)  On March 28, 2022, the Appeals Council denied Edwards' request for review, and the ALJ's decision became the final determination of the Commissioner.  (R. 1-7.)

Edwards filed his Complaint in this action on May 26, 2022, seeking district court review pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).  (Dkt. 1.)  On August 31, 2022, the parties consented to my jurisdiction for all purposes.  (Dkt. 15.)  On January 23, 2023,

---

[1] Although the Administrative Law Judge's ("ALJ") August 12, 2021 decision denying benefits to Edwards maintains that Edwards filed for DIB on July 7, 2020 (R. 11), Edwards' application identifies the date as July 8, 2020 (R. 269-74).

[2] "R." refers to the certified administrative record at Dkt. 16.

Edwards moved to remand for further proceedings.  (Dkts. 23-25.)  The Commissioner cross-moved for judgment on the pleadings on March 23, 2023.  (Dkts. 28-29.)  On April 12, 2023, Edwards filed his reply, at which time the issue was fully briefed.  (Dkt. 30.)

## APPLICABLE LAW

### A.    Standard Of Review

A United States District Court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner.   42 U.S.C. § 405(g); *Skrodzki v. Commissioner Of Social Security Administration*, 693 F. App'x 29, 29 (2d Cir. 2017) (summary order).  The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012) (same).

"'Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations.'"  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (remanding for noncompliance with regulations)).  Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles*. See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (reversing where the court could not "ascertain whether [the ALJ] applied the correct legal principles … in assessing [plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F. Supp.2d 507, 515, 520 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'" *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)); *see also Biestek v. Berryhill*, __ U.S. __, __, 139 S. Ct. 1148, 1154 (2019) (reaffirming same standard).   "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal quotation marks omitted) (emphasis in original); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."   42 U.S.C. § 423(d)(5)(B).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."  42 U.S.C. § 405(b)(1).  While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "'reconcile explicitly every conflicting shred of medical testimony,'" *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or

4

mischaracterize evidence of a person's alleged disability.  *See Ericksson v. Commissioner Of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-CV-1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).  The court must afford the Commissioner's determination considerable deference and "may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."  *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary Of Health And Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984)); *Dunston v. Commissioner of Social Security,* No. 14-CV-3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (same) (quoting *Jones*, 949 F.2d at 59), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. Apr. 2, 2015).  Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the claimant's position.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The court, however, will not defer to the Commissioner's determination if it is "the product of legal error."  *Dunston*, 2015 WL 54169 at *4 (internal quotation marks omitted) (citing, *inter alia*, *Douglass*, 496 F. App'x at 156; *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)).

**B.    Legal Principles Applicable To Disability Determinations**

Under the Act, a person meeting certain requirements and considered to have a "disability" is entitled to disability benefits.   42 U.S.C. § 423(a)(1).   The Act defines

disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled and therefore entitled to disability benefits, the Commissioner conducts a five-step inquiry.  20 C.F.R. § 404.1520.[3]  First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i), (b).  If so, the claimant is not eligible for benefits and the inquiry ceases.

If the claimant is not engaged in any such activity, the Commissioner proceeds to the second step and must determine whether the claimant has a "severe impairment," which is an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii), (c).  If

---

[3] Because this case is about Edwards' application for DIB benefits, the Court cites to regulatory standards for DIB determinations, which are found at 20 C.F.R. § 404.900, *et seq.*  Those regulations parallel the standards for Supplemental Security Income ("SSI"), which are found at 20 C.F.R. § 416.901, *et seq.*, or both.  *See Coulter v. Commissioner of Social Security*, No. 22-CV-1149, 2023 WL 3346505, at *2 n.1 (S.D.N.Y. May 10, 2023) ("The regulations for disability and disability insurance and supplemental security income benefits are virtually identical.  The DIB regulations are found at 20 C.F.R. § 404.900, *et seq.*, while the parallel SSI  regulations are found at 20 C.F.R. § 416.901, *et seq.*") (quoting *Canter v. Saul*, No. 19-CV-00157, 2020 WL 887451, at *1 n.2 (D. Conn. Feb. 24, 2020)).

the claimant does not have an impairment or combination of impairments that are "severe," the claimant is not entitled to benefits and the inquiry ends.

If the claimant has a severe impairment or combination of impairments, the Commissioner continues to step three and must determine whether the impairment or combinations of impairments is, or medically equals, one of those included in the "listings" of the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment or impairments meet or medically equal one of those listings, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits.  20 C.F.R. § 404.1520(a)(4)(iii), (d).

If the claimant does not meet the criteria for being presumed disabled, the Commissioner continues to step four and must assess the claimant's residual functional capacity ("RFC"), which is the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her impairments.  The Commissioner then determines whether the claimant possesses the RFC to perform the claimant's past work. 20 C.F.R. § 404.1520(a)(4)(iv), (e)-(f).  If so, the claimant is not eligible for benefits and the inquiry stops.

If the claimant is not capable of performing prior work, the Commissioner must continue to step five and determine whether the claimant is capable of performing other available work.  20 C.F.R. § 404.1520(a)(4)(v), (h).  If the claimant, as limited by her RFC, can perform other available work, the claimant is not entitled to benefits.  20 C.F.R. § 404.1520(a)(4)(v).  The claimant bears the burden of proof for the first four steps.  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  Once the claimant has established that she is unable to perform her past work, however, the Commissioner bears the burden of

showing at the fifth step that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

## C.   Evaluation Of Medical Opinion Evidence

ALJs must consider medical opinion evidence of record.  *Rodriguez v. Colvin*, No. 12-CV-3931, 2014 WL 5038410, at *17 (S.D.N.Y. Sept. 29, 2014).  The standards applied depend on when an applicant filed their claim for benefits.  For claims filed prior to March 27, 2017, regulations require application of the so-called "treating physician rule," pursuant to which the opinion of a claimant's treating physician presumptively was entitled to "controlling weight."  20 C.F.R. § 404.1527(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must determine how much weight, if any, to give that opinion. *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019).  In doing so, the ALJ must "explicitly consider" the following, non-exclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(d)(2))).  While failure to explicitly apply the *Burgess* factors is a procedural error, a reviewing court will not reverse the Commissioner's decision when the Commissioner has given "good reasons" for its weight assignment. *Estrella*, 925 F.3d at 96.  With respect to assigning weight to the opinions of non-treating physicians, an ALJ applying the earlier regulations must consider the same factors evaluated when the ALJ does not give controlling weight to a treating physician. 20 C.F.R. § 404.1527(c).

For claims filed on or after March 27, 2017, the regulations promulgated in 20 C.F.R. § 404.1520c apply.  Under the new regulations, a treating doctor's opinion is no longer entitled to a presumption of controlling weight.  Instead, all medical opinions must be assessed for persuasiveness under the same standard of supportability and consistency with no presumption that one opinion carries more weight than another.  20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) … including those from your medical sources").

The new regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight, i.e., the extent to which a treating physician's opinion is supported by well-accepted medical evidence and not inconsistent with the rest of the record.  20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions … are supportability … and consistency").  In most instances, the ALJ may, but is not required to, discuss the other factors previously required to assess medical opinion evidence (i.e., relationship with the claimant, specialization, and other relevant factors).  20 C.F.R. § 404.1520c(b)(2), (c)(3)-(5).  The ALJ must consider those additional factors if there are "two or more medical opinions or prior administrative medical findings about the same issue [that] are both equally well-supported … and consistent with the record … but are not exactly the same."[4]  20 C.F.R. § 404.1520c(b)(3).

---

[4] More specifically, if medical opinions on the same issue are equally well-supported and consistent with the record but are not identical, the ALJ must "articulate how [he] considered the other most persuasive factors."  20 C.F.R. § 404.1520c(b)(3).  Of the

An ALJ must not only consider supportability and consistency in evaluating medical source opinions but also must explain the analysis of those factors in the decision. 20 C.F.R. § 404.1520c(b)(2); *Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *R. & R. adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("in cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion") (emphasis in original). As noted in the Administration's revisions to the regulations, "the articulation requirements in [the] final rules" are intended to "allow a … reviewing court to trace the path of an adjudicator's reasoning … ." Revisions To Rules Regarding The Evaluation Of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819, at 5858 (Jan. 18, 2017); *see also Amber v. Saul*, No. 20-CV-490, 2021 WL 2076219, at *4 (N.D.N.Y. Feb. 24, 2021) ("Although the new regulations eliminate the perceived hierarchy of medical sources … the ALJ must still 'articulate how [he or she] considered the medical opinions' and 'how persuasive [he or she] find[s] all of the medical opinions'") (alterations in original) (quoting 20 C.F.R. § 404.1520c(a),(b)(1)).

---

remaining factors, the third is the relationship with the claimant, for which the ALJ must consider the (1) length of the treatment relationship, (2) frequency of examinations, (3) purpose of the treatment relationship, (4) extent of the treatment relationship, and (5) examining relationship. *See* 20 C.F.R. § 404.1520c(c)(3). The fourth factor – specialization – requires the ALJ to account for whether the medical opinion is provided by a specialist that has expertise in the area related to the medical issue. *See* 20 C.F.R. § 404.1520c(c)(4). Lastly, the fifth factor is a catchall, which accounts for "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." That "includes, but is not limited to, evidence showing a medical source has familiarity with other evidence in the claim or an understanding of [the Administration's] disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(5).

Under the previous regulations, an ALJ's failure to consider the factors prescribed by the treating physician rule was grounds for remand. Similarly, under the current regulations, an ALJ's failure to properly consider and apply the requisite factors is grounds for remand. *See, e.g.*, *Rivera v. Commissioner Of Social Security*, No. 19-CV-4630, 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *R. & R. adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (remanding so that ALJ may "reevaluate the persuasiveness assigned to the opinion evidence of record and explicitly discuss both the supportability and the consistency of the consulting examiners' opinions"); *Andrew G. v. Commissioner Of Social Security*, No. 19-CV-942, 2020 WL 5848776, at *6-9 (N.D.N.Y. Oct. 1, 2020) (remanding due to ALJ's failure to adequately explain the supportability or consistency factors that led her to her decision). As Edwards' application post-dates March 27, 2017, the Court applies the revised regulations applicable to evaluation of medical opinions.

## BACKGROUND

### A.    Edwards' Personal And Employment History

Edwards was born on November 29, 1978. (R. 314.) He has a GED and received special education through tenth grade for learning disabilities and behavioral issues. (R. 298.) He previously worked as a groundskeeper, casino cash handler, stocker, and a school custodian. (R. 22, 299.) In 2017, Edwards injured his back while lifting garbage cans on the job as a school custodian. (R. 1183.) As a result of his injuries, he was unable to work and received treatment through Workers' Compensation. Edwards settled his Workers' Compensation case on August 16, 2019, when it was determined that he had reached maximum medical improvement for his back. (R. 251-57.) Edwards has not worked since 2017. (R. 1602.)

**B.     Medical Treatment Record And Opinions**

This medical history section sets forth only facts that the Court deems most pertinent and focuses on physical impairments to Edwards' neck and back as well as his various mental impairments.

**1.     Edwards' Physical Impairments**

**a.     Treatment Records**

Edwards began treatment for his cervical and lumbar spine pain in 2017 at Crystal Run Healthcare ("Crystal Run") and Advance Physical Therapy & Chiropractic, P.L.L.C ("Advance Physical") following his work injury.  An April 2017 X-ray conducted at Crystal Run showed mild degenerative changes to his cervical and lumbar spine.  (R. 368.)  At an initial physical therapy examination with Advance Physical also in April 2017, Edwards described severe lower back pain with exertion that radiated to his legs and was reduced by medication and rest.  (R. 652.)  Examination revealed antalgic gait and posture, decreased thoraco-lumbar spine range of movement, and increased sensitivity in the left lower extremity.  (R. 653.)  Evaluation of the lumbar spine revealed bilateral tenderness; sacroiliac testing revealed bilateral moderate to severe positive findings and muscle testing was poor plus.  (R. 654.)  Edwards was diagnosed with low back pain, radiculopathy in the lumbar region, and back muscle spasms, and found totally disabled and unable to work.  (R. 654-55.)  Advance Physical's May 2017 re-evaluation noted that Edwards' condition was moderately improved but that he remained totally disabled and unable to work.  (R. 658-59.)

In June 2017, Edwards underwent a medical examination through Workers' Compensation.  (R. 374.)  On examination, his gait, sensory exam, and motor exam were normal, but he had reduced range of motion in his neck and back.  (R. 375.)  The

impression was chronic cervical and low back pain with a fair prognosis, and he was awarded moderate partial disability of 50%.  (R. 375.)  The examiner noted that Edwards could work full time with no lifting of more than 20 pounds on an occasional basis only and no repetitive bending or any squatting, kneeling, or crawling.  (R. 375.)  Edwards underwent an independent chiropractic examination in July 2017, which noted resolved cervical sprain/strain and chronic lumbar sprain/strain with a favorable prognosis.  (R. 377.)  He was awarded 25% temporary partial disability and was cleared for light work with restrictions.  (R. 377.)  An addendum changed Edwards' diagnosis to chronic lumbar sprain/strain secondary to degenerative disease at L4-5 and L5-S1.  (R. 383.) Throughout 2017 and 2018, Edwards continued to present for treatment, including with pain management, underwent several injections and radiation to the spine, and reported at times both worsening and improving pain.  (*See* R. 361-63, 636, 638, 640-44, 664-65, 667-68, 1218.)

In April 2019, Edwards presented to Dr. Zoltan Fekete ("Dr. Fekete") at Crystal Run with moderate cervical and spine pain with muscle spasms.  (R. 1189-94.)  Notes indicate that Edwards had received 70% disability because of neck, cervical spine, and lower back pain; upon examination, he had muscle spasms and a moderate range of motion with pain in both his cervical and lumbar spines.  (R. 1192.)  He was diagnosed with cervical radiculopathy due to trauma and bilateral lumbar radiculopathy.  (R. 1193.) Edwards returned to Dr. Fekete in December 2019.  (R. 1183.)  Treatment notes indicate that Edwards received 75% disability from Workers' Compensation (R. 1183) and a review of systems found moderately severe pain in the lumbosacral spine; mildly severe pain in the cervical spine (R. 1186); and mild pain with motion and muscle spasms in both

the cervical and thoracic spines (R. 1187).   Dr. Fekete found bilateral lumbar radiculopathy and cervical radiculopathy due to trauma, the latter of which was not improving.  (R. 1187.)

Edwards saw Dr. Fekete again in May 2020, complaining of moderately severe neck pain radiating to his left shoulder and low back pain radiating to both buttocks with an intensity of six out of ten, and reported being on Workers' Compensation at 75% disability.  (R. 1198.)  Dr. Fekete's assessment was largely unchanged.  (R. 1198-202.) Edwards returned to Dr. Fekete in May 2021, stating that he was no longer on Workers' Compensation since settling his case and that his neck pain was at a four to five out of ten, while his low back pain was at a seven to eight when walking and a two to three when sitting.  (R. 1831.)  Dr. Fekete assessed moderate to severe pain and decreased range of motion in both the cervical and lumbosacral spines as well as neck stiffness.  (R. 1833.)

### b.   Opinion Evidence About Physical Impairments

The medical record contains opinion evidence from a consultative examiner and prior administrative medical findings ("PAMFs"), but none from a treating source.

On September 25, 2020, Dr. Paul Mercurio performed a consultative internal medicine examination on Edwards.  (R. 1293.)  Edwards reported aching neck pain that radiated to his shoulders and arms of a five out of ten intensity for which medication was ineffective, as well as aching low back pain that radiated to his hips, legs, and feet of a five out of ten intensity.  (R. 1293.)  Edwards stated that he did not use assistive devices and had no past hospitalizations.  (R. 1293.)  On examination, Edwards had a normal gait and stance, full range of motion in his hips, knees, ankles, elbows, forearms, and wrists bilaterally, could perform a half squat, and did not need help changing, getting on and off the exam table, or rising from the chair.  (R. 1294-95.)  His cervical spine had full flexion

and extension, although his lumbar spine flexion and bilateral shoulder elevation were limited.  (R. 1295.)  Based on his examination and review of x-rays of Edwards' lumbosacral and cervical spine, Dr. Mercurio opined that Edwards had no limitations hearing, seeing, speaking, sitting, or handling objects; mild limitation for prolonged standing, walking, climbing stairs, or reaching; and moderate limitations for repetitive bending, lifting, carrying, kneeling, and overhead reaching.  (R. 1296.)

On October 28, 2020, non-examining state agency physician Dr. S. Putcha ("Dr. Putcha") reviewed Edwards' records, including Dr. Mercurio's opinion and Workers' Compensation, Advance Physical, and Crystal Run medical records.  (R. 93-95.)  Based on those records alone, Dr. Putcha opined that Edwards could lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk or sit for six hours in an eight-hour workday, and push/pull to the extent consistent with the lifting and carrying requirements.  (R. 93-94.)  On March 23, 2021, after reviewing the record at the reconsideration stage, Dr. R. Mohanty ("Dr. Mohanty") agreed with Dr. Putcha's assessed limitations.  (R. 111-14.)

### 2. Edwards' Mental Impairments

#### a. Treatment Records

Since 2012, Edwards has received mental health treatment at Synergy of Monticello ("Synergy").  In 2018, he was diagnosed with anxiety, depression, and personality disorders and given biweekly appointments for therapy.  (R. 1152-54.)  From the alleged onset date of June 5, 2019 through the ALJ's decision on February 22, 2021, Edwards received mental health care from psychiatrist Dr. Peter Panzarino ("Dr. Panzarino") and registered licensed clinical social worker Nadine Leontay ("Leontay").

15

On October 30, 2019, Edwards presented for an appointment with Dr. Panzarino, reporting that he was a "nervous wreck," "anything triggers [his anxiety]," and "nothing good is happening."  (R. 1458.)  After conducting a mental status examination, Dr. Panzarino stated that Edwards appeared alert, oriented, and well without any signs of acute distress.  (R. 1458.)  He also found overall appropriate behavior, clear and appropriate thought process and speech, intact memory and associative thinking, good eye contact, normal impulse control and attention span and concentration, and knowledge and vocabulary consistent with education level.  (R. 1458.)  Dr. Panzarino assessed that Edwards' anxiety was "ongoing and related to situational stressors" and that his "depression [was] stable," and prescribed hydroxyzine, buspirone, and sertraline.  (R. 1458.)

Edwards returned to Dr. Panzarino on March 5, 2020, stating that he felt worse, had symptoms of anxiety, and believed the medications were making him lose focus while driving.  (R. 1444.)  Dr. Panzarino's mental status examination findings were unchanged and Edwards' Mini-Mental State Examination [5] results were normal.  (R. 1444.)  Dr. Panzarino reported that Edwards' anxiety and depression were stable on medication and continued his prescriptions.  (R. 1444.)  Edwards presented to Dr. Panzarino for further follow-ups on October 27, 2020 and March 25, 2021, reporting symptoms of anxiety and

---

[5] "The Mini-Mental State Examination … is a simple pen-and-paper test of cognitive function … [that] includes tests of orientation, concentration, attention, verbal memory, naming and visuospatial skills," and it is "the best-known and the most often used short screening tool for providing an overall measure of cognitive impairment in clinical, research and community settings."  *See* Ingrid Arevalo-Rodriguez et al., *Mini-Mental State Examination (MMSE) For The Early Detection Of Dementia In People With Mild Cognitive Impairment (MCI)*, 2021(7) COCHRANE DATABASE SYST. REV., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8406467/ (last visited Aug. 30, 2023).

depression.   (R. 1788, 1906.)   Dr. Panzarino's findings remained unchanged, and he continued to prescribe medication.  (R. 1788, 1906.)

During the relevant period, Edwards attended over thirty therapy sessions with Leontay.   Leontay's notes indicate that Edwards was experiencing financial insecurity (*see, e.g.,* 1438, 1442, 1446, 1448, 1468, 1914), as well as familial and martial problems that culminated in a separation and custody dispute with his ex-wife (*see, e.g.,* R. 1422, 1424, 1429, 1432, 1434, 1446, 1454, 1910), and that therapy was focused on helping him cope with stressful life events (*see e.g.* R. 1426, 1428-29, 1432, 1434, 1436, 1454). Edwards several times reported becoming quickly enraged (*see, e.g.,* R. 1422, 1432, 1442, 1452, 1456), trouble with money (*see e.g.* 1438, 1440, 1448, 1468), and feelings of embattlement and vengefulness (*see e.g.* R. 1422, 1424, 1426, 1432, 1912).

On December 28, 2020, Edwards presented for psychotherapy with Leontay and "state[d] he is angry that Synergy is not completing a form so that he can get disability" and that "he wants [the] Doctor to write that he is not able to work [because] he believes this will give him disability."   (R. 1792.)   Edwards intimated that he needed disability money in part because he had spent all his Workers' Compensation settlement money. (R. 1792.)

In every session, Leontay conducted a mental status examination and consistently found no signs of acute distress, overall appropriate behavior, clear and appropriate thought process and speech, intact memory and associative thinking, good eye contact, normal impulse control and attention span and concentration, knowledge and vocabulary consistent with education level, and that Edwards was alert and oriented.  (*See* R. 1422, 1424, 1426, 1429, 1432, 1434, 1436, 1438, 1440, 1442, 1446, 1448, 1450, 1452, 1454,

1456, 1460, 1462, 1464, 1466, 1468, 1470, 1472, 1900, 1902, 1904, 1908, 1910, 1912, 1914, 1916, 1918.)

Additionally, when Edwards presented for internal medicine care at Crystal Run, doctors noted his mental status and reviewed his cognitive and neurological systems.  He several times reported anxiety, irritability, combativeness, and depression, although the doctors noted that he was stable on the medications prescribed by Dr. Panzarino.  (*See, e.g.,* R. 1185-88,1198-1200, 1831-34.)

### b.    Opinion Evidence About Mental Impairments

The medical record contains opinion evidence from a consultative examiner and PAMFs.  There is no opinion evidence from either Dr. Panzarino or Leontay.

On October 16, 2020, Edwards presented to Dr. Konstantinos Tsoubris ("Dr. Tsoubris") for a consultative psychiatric examination.  (R. 1602-06.)  Dr. Tsoubris performed a mental status examination, finding Edwards irritable with poor social skills, a restricted affect, borderline cognitive functioning, and poor insight and judgment.  (R. 1603-04.)  Dr. Tsoubris also found Edwards' attention, concentration, and memory skills intact, his thought process coherent, and his voice clear.  (R. 1603-04.)  Based on the evaluation and Edwards' vocational and educational history, Dr. Tsoubris opined that Edwards had no limitations understanding, remembering, or applying simple or complex directions and instructions; sustaining concentration and performing a task at a consistent pace; and in his awareness of normal hazards and taking appropriate precautions.  (R. 1604-05.)

However, Dr. Tsoubris opined that Edwards had marked limitations in his ability to make use of reason and judgment to make work related decisions; interact adequately with supervisor, coworkers, and the public; sustain an ordinary routine and regular

attendance at work; and regulate emotions, control behavior, and maintain well-being. (R. 1604-05.)   Dr. Tsoubris also opined moderate limitations in Edward's ability to maintain personal hygiene and appropriate attire.  (R. 1604.)  Overall, Tsoubris diagnosed Edwards with an unspecified neurodevelopmental disorder, major depressive disorder, unspecified anxiety disorder with panic attacks, intermittent explosive disorder, and paranoid personality disorder and stated that his prognosis was "[g]uarded, given the severity of symptoms."  (R. 1605.)

The record also contains medical opinions from two non-examining state agency psychologists – Dr. Y. Sherer ("Dr. Sherer") and Dr. L. Hoffman ("Dr. Hoffman") – who reviewed the medical records, including the Synergy treatment records and Dr. Tsoubris' opinion evidence, to form their opinions.  On October 29, 2020 and based on the paper record, Dr. Sherer opined that Edwards had no limitations understanding, remembering, or applying information, and only mild limitations interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself.  (R. 91.)  He also concluded that Edwards' "mental impairment is deemed as non-severe and secondary to his physical impairment."  (R. 92.)  On February 23, 2021 at the reconsideration stage, Dr. Hoffman, again based on the paper record, affirmed Dr. Sherer's findings that Edwards had no more than mild limitations in any area of mental functioning and again noted that Edwards' mental impairments were non-severe.  (R. 104-09.)

## C.    The Hearing Testimony

### 1.    Edwards' Testimony

At the July 27, 2021 hearing, Edwards testified that he lived in a trailer on his parents' property with his three children, of whom he has physical custody, and his girlfriend.  (R. 61-62.)  His relationship with his parents is historically rocky but getting

better.  (R. 62.)  Edwards is the primary caregiver for his children, although he receives help from his girlfriend when she is home.  (R. 65-66.)  He does not go far from home, is always with his girlfriend, and only eats out at small restaurants because he does not get along with everybody.  (R. 63.)  Yet, Edwards said that he does get along well enough with teachers to participate in parent-teacher conferences.  (R. 66.)  He testified that his girlfriend always accompanies him when he drives for short periods but that he could drive alone when he was single.  (R. 66-67.)  Edwards shops at Walmart because his girlfriend works there and brings groceries home.  (R. 67.)  If he needs something else, he goes to the convenience store one to two minutes away.  (R. 67.)

Edwards testified that he is in individual therapy, plays games on the iPad in his spare time, and does not exercise at all.  (R. 68.)  He can fold clothes with his girlfriend and wash silverware, which causes his back to tighten.  (R. 68-69.)  Although his children often pick up after themselves, he can wipe off the kids' table.  (R. 68-69.)  He can cook eggs and cooked spaghetti once, but his kids mostly eat cereal and chicken nuggets that they prepare themselves.  (R. 71.)  He prepares dinner with his girlfriend's help.  (R. 71.)

Edwards reported not having received any treatment for his back since settling his Workers' Compensation case in 2019 because he was told that he had reached his medical maximum of improvement.  (R. 72-73.)  He stated that he takes sodium pills prescribed by a Crystal Run doctor for his back but that they do not relieve tightness.  (R. 73.)  He cannot lift more than ten pounds before having to break to relieve back tightness and stated that his weight has no effect on his back pain.  (R. 73.)

Edwards is in therapy and takes medication for his mental health.  (R. 74.)  His mental health limits his ability to work because he feels his coworkers are against him

and trying to pick him apart to enrage him; in return, he tries to get them in trouble.  (R. 75.)  He experiences rages that last for thirty to forty minutes and cause him to black out.  (R. 75.)  During previous rages, he has broken a staircase, stabbed a tire in his car, and pounded on his parents' door to the point where they threatened to have him admitted.  (R. 75.)  After he emerges from a rage, Edwards takes Xanax which causes him to sleep for two to three hours.  (R. 75.)  Upon awakening, he feels guilt, anxiety, and depression for what he has done.  (R. 75-76.)  He reported some relief with therapy and medications, although his prescriptions for Zoloft, Buspar, and Hydroxyzine make him drowsy and impact his ability to concentrate and drive.  (R. 76-77.)

Edwards testified that he can only walk for ten minutes and sit upright at a desk for at most twenty minutes before needing to take a break.  (R. 77-78.)  He is most comfortable laying on his back and lays down at least once a day on a regular day and two to three times on his worst days for up to two hours.  (R. 78.)  Since he has been home, his rages occur weekly.  (R. 78-79.)  While he was working, he experienced rages daily, during which he would lose concentration, refuse to work, and be threatened with insubordination.  (R. 79.)

### 2.     The VE's Testimony

The VE testified that Edwards' past relevant work experiences were all at least at the medium exertion level.  (R. 80.)  The ALJ asked the VE whether the following hypothetical individual could perform Edwards' past work:  an individual of the same age, education, and work history as Edwards who could perform the full range of light work with certain exertional limitations and who was limited to understanding, remembering, and carrying out simple routine tasks with regularly scheduled breaks at two-hour intervals, with decision-making and changes in work setting related to simple routine

tasks, and with brief and superficial interaction with the general public and occasional interaction with co-workers and supervisors but without tandem tasks.  (R. 80-81.)  The VE stated that such an individual would be unable to perform Edwards' past work but could perform other jobs as a garment sorter, tagger, and shirt folder.  (R. 81.)  The VE testified that full-time work would be precluded if an individual's time off-task time was greater than fifteen percent or if they missed more than two days of work per month.  (R. 81-82.)

### D.     The ALJ's Decision

After the hearing, the ALJ rendered an unfavorable decision following the five-step analysis.  (R. 8-29.)  At step one, the ALJ found that Edwards had not engaged in substantial gainful activity since his alleged onset date of June 5, 2019.  (R. 13.)  At step two, the ALJ determined that Edwards had several severe impairments:  cervical spine degenerative disc disease; lumbar spine degenerative disc disease; obesity; depressive disorder; anxiety disorder; personality disorder; and intermittent explosive disorder.  (R. 14.)  The ALJ also noted that Edwards had non-severe impairments consisting of diabetes mellitus and a fatty liver.  (R. 14.)

At step three, the ALJ found that Edwards did not have an impairment or combination of impairments that met or equaled the severity of any listed impairment.  (R. 14.)   The ALJ considered the following sections from listings 1.00 (musculoskeletal disorders) and 12.00 (mental disorders):  1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)); 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina); 12.04 (depressive, bipolar and related disorders); 12.06 (anxiety and obsessive-compulsive disorders); and 12.08 (personality and impulse-control disorders).  (R. 14-15.)  For the sections from listing 1.00, the ALJ also considered Edwards' obesity,

finding it to be severe but "not of such severity as found in any listing" and that the record evidence "does not document significant limitations due to obesity" or "that obesity has resulted in an exacerbation of co-existing medical problems." (R. 14-15.) For the sections from listing 12.00, the ALJ considered whether the "paragraph B" criteria were met. (R. 15.) "To satisfy the 'paragraph B' criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning." (R. 15.) The ALJ found Edwards to have a mild limitation "[i]n understanding, remembering, or applying information"; a moderate limitation "[i]n interacting with others"; a moderate limitation "[i]n concentrating, persisting, or maintaining pace"; and a moderate limitation in "adapting and managing oneself." (R. 15-16.) The ALJ also found that Edwards did not meet the "paragraph C" criteria because Edwards "[did] not present with a 'serious and persistent' disorder … including, but not limited to having reached only a marginal adjustment despite ongoing persistent treatment." (R. 16.)

Next, the ALJ concluded that Edwards had the RFC to perform light work, except that he could occasionally use ramps and stairs; never use ladders, ropes, or scaffolds; occasionally balance, stool, kneel, crouch, and crawl; and frequently reach. (R. 16.) Additionally, the ALJ found that Edwards is able to understand, remember, and carry out simple and routine tasks with regular breaks at two-hour intervals, with decision making and changes in work setting related to simple and routine tasks, and brief and superficial interaction with coworkers and supervisors without working in tandem. (R. 16-17.) The ALJ considered Edwards' description of his impairments but found that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence" and described the opinion and objective

medical evidence used to reach this conclusion.  (R. 19-21.)  At step four, the ALJ determined that Edwards could not perform his past work as a school janitor, casino cash handler, and stocker because those jobs were all performed at a medium exertion level. (R. 22.)

At step five, the ALJ, referencing the VE's testimony, found that there were jobs that exist in significant numbers in the national economy that Edwards can perform.  (R. 23.)  The ALJ stated that the information contained in the Dictionary of Occupational Titles for a tagger and shirt folder require constant, not frequent, reaching and that the VE did not consider that discrepancy.  (R. 23.)  As such, the ALJ did not consider those two positions in making his determination.  (R. 23.)  Still, the ALJ found that the job of garment sorter with 222,000 positions in the national economy "constitute[d] a significant number of jobs" that Edwards could perform.  (R. 23.)  The ALJ thus found Edwards was not disabled.  (R. 23-24.)

In making his RFC determination, the ALJ considered Edwards' testimony, the treatment notes, and the opinions of the consultative examiners and the PAMFs. Regarding Edwards' physical impairments, the ALJ found the PAMFs Drs. Putcha and Mohanty's opinions persuasive, while consultative examiner Dr. Mercurio's opinion was only partially persuasive.  (R. 21.)  For Edwards' mental impairments, the ALJ found the PAMFs Drs. Sherer and Hoffman's opinions persuasive "only to the extent of finding no marked limitations" since "the evidence does support more than mild limitations."  (R. 21.) The ALJ found consultative examiner Dr. Tsoubris' opinion unpersuasive.  (R. 22.)

**DISCUSSION**

Edwards advances three reasons why the ALJ's decision should be rejected.  First, he contends that the RFC was unsupported by the evidence of record because, in part, "[t]he ALJ neither sought nor received any opinions from [Edwards'] treating sources" and thereby failed to sufficiently develop the record.  (Pl. Mem. at 16.[6])  Edwards also argues that the ALJ did not properly evaluate Dr. Tsoubris' findings and that the ALJ's RFC was not supported by substantial evidence.  (R. 14-19, 20-23.)  Last, Edwards asserts that 222,000 garment sorter jobs does not constitute a significant range of work.  (R. 20.)  The Commissioner disagrees, arguing that the record was sufficiently developed; the ALJ appropriately analyzed the medical opinions including that of Dr. Tsoubris; substantial evidence supports the ALJ's RFC determination; and 222,000 job positions in the national economy that can be performed by someone with Edwards' RFC qualifies as significant.  (Def. Mem. at 12-29.[7])  The Court agrees with the Commissioner.  The Court first discusses the development of the record, before turning to the question of substantial evidence, including the ALJ's evaluation of Dr. Tsoubris' opinion, and ends with a discussion of the ALJ's conclusions at Step Five.

**A.     The ALJ Did Not Fail To Adequately Develop The Record**

"Before determining whether the Commissioner's conclusions are supported by substantial evidence," a court "must first be satisfied that the claimant has had a full

---

[6] "Pl. Mem." refers to Plaintiff's Memorandum Of Law In Support Of Plaintiff's Motion For Remand For Further Administrative Proceedings, filed on January 23, 2023 at Dkt. 25.

[7] "Def. Mem." refers to Defendant's Memorandum Of Law In Support Of Defendant's Cross-Motion For Judgment On The Pleadings And In Opposition To Plaintiff's Motion For Judgment On The Pleadings, filed on March 23, 2023 at Dkt. 29.

hearing under the … regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alterations in original) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Whether an ALJ has satisfied his or her duty to develop the administrative record is a threshold question. *See Sanchez v. Saul*, No. 18-CV-12102, 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 13, 2020) ("As a threshold matter, … this Court must independently consider the question of whether the ALJ failed to satisfy his duty to develop the Record."), *R. & R. adopted*, 2020 WL 1330215 (S.D.N.Y. March 23, 2020).

Edwards alleges that the ALJ failed in his duty to develop the record because "[t]he ALJ neither sought nor received any opinions from Plaintiff's treating sources" (Pl. Mem. at 16) and relied "on defective or untimely opinions" (Pl. Reply at 6[8]). In opposition, the Commissioner argues that, despite the lack of treating source opinions, the record contained sufficient record and opinion evidence. (R. 27.) The Commissioner is correct; the ALJ fulfilled his obligation to sufficiently develop the record.

### 1.    Duty To Develop The Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). An ALJ must therefore "investigate the facts and develop the arguments both for and against granting benefits," *id.* at 111, and has "regulatory obligations to develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *see* 20 C.F.R. § 404.1512(b)(1). That obligation results from the non-adversarial nature of the instant

---

[8] "Pl. Reply" refers to Plaintiff's Reply Memorandum Of Law In Opposition To Defendant's Cross-Motion For Judgment On The Pleadings And In Further Support Of Plaintiff's Motion For Remand For Further Administrative Proceedings, filed on March 12, 2023 at Dkt. 30.

proceedings and exists "even when … the claimant is represented by counsel." *Pratts*, 94 F.3d at 37; *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record").

Prior to elimination of the treating physician rule, cases often were remanded where an ALJ failed to develop the record by obtaining an opinion from the claimant's treating physician. *See, e.g. Romero v. Commissioner of Social Security*, No. 18-CV-10248, 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020) (stating, in context of a pre-2017 application, that "ALJs fail to satisfy their duty to develop the record by having a record with the only functional assessment coming from a CE after a single examination and failing to request (and receive) a functional assessment from the treating physician(s)") (collecting cases); *Vera v. Barnhart*, No. 04-CV-7764, 2007 WL 756577, at *10 (S.D.N.Y. March 13, 2007) (remanding because the "ALJ had a clear duty to seek an opinion from [claimant's treating physician] regarding the existence, the nature, and the severity of the plaintiff's claimed disability" but did not).

However, an ALJ's failure to obtain a treating source opinion did not necessarily require remand. *See Swiantek v. Commissioner Of Social Security*, 588 F. App'x 82, 84 (2d Cir. 2015) ("the absence of a medical source statement from claimant's treating physician [is not always] fatal to the ALJ's determination"). As the Second Circuit explained, an ALJ's failure to request medical source opinions is not per se a basis for remand where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Commissioner Of Social Security*, 521 F. App'x 29, 34 (2d Cir. 2013). The need for a medical source statement from the treating

physician hinged "on [the] circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." *Sanchez v. Colvin*, No. 13-CV-6303, 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*, 521 F. App'x at 33-34).

Although the treating physician rule has been abolished, the principle espoused by *Tankisi* still applies:  whether remand is required because of failure to obtain an opinion from the claimant's treating physician depends on whether the ALJ could have reached an informed decision based on substantial evidence without it.  *Compare Manzella v. Commissioner Of Social Security*, No. 20-CV-3765, 2021 WL 5910648, at *14-16 (S.D.N.Y. Oct. 27, 2021), *R & R adopted*, 2021 WL 5493186 (S.D.N.Y. Nov. 22, 2021) (recognizing continued force of *Tankisi* but remanding, among other reasons, because record was not sufficient without medical source statements from claimant's treating physicians); *Prieto v. Commissioner Of Social Security*, No. 20-CV-3941, 2021 WL 3475625, at *11 (S.D.N.Y. Aug. 6, 2021) (remanding where ALJ failed to make requisite follow-up attempt to obtain medical opinions from either of claimant's treating physicians); *Angelica M. v. Saul*, No. 20-CV0727, 2021 WL 2947679, at *9 (D. Conn. July 13, 2021) (remanding and directing ALJ to seek updated medical source statement from treating therapist and treating physician); *with Brian Z. v. Commissioner Of Social Security*, No. 20-CV 737, 2021 WL 3552525, at *9-10 (N.D.N.Y. Aug. 11, 2021) (ALJ was not required to further develop record by contacting treating sources for medical source statement because medical records, plaintiff's testimony, and persuasive opinion evidence provided substantial evidence for RFC determination).

The ALJ's duty to develop the record is "enhanced when the disability in question is a psychiatric impairment."  *Lacava v. Astrue*, No. 11-CV-7727, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012), *R & R adopted* 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012); *see also Merriman v. Commissioner of Social Security*, No. 14-CV-3510, 2015 WL 5472934, at *19 (S.D.N.Y. Sept. 17, 2015) (duty to develop the record for mental impairments is considered "particularly important" because of "the difficulty in determining" whether individuals suffering from mental disabilities "will be able to adapt to the demands or 'stress' of the workplace"); *Telesco v. Commissioner of Social Security*, 577 F. Supp.3d 336, 354 (S.D.N.Y. 2021) (same).  "This 'heightened duty' derives from the fact that a claimant's mental illness may greatly impede an evaluator's assessment of a claimant's ability to function in the workplace, thus necessitating more thorough review." *Marinez v. Commissioner of Social Security*, 269 F. Supp.3d 207, 215 (S.D.N.Y. 2017) (citing *Gabrielsen v. Colvin*, No. 12-CV-5694, 2015 WL 4597548, at *4 (S.D.N.Y. July 30, 2015)).

"A mental health patient may have good days and bad days; [they] may respond to different stressors that are not always active.  Thus, the longitudinal relationship between a mental health patient and [their] treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be achieved with a single consultative examination."  *Telesco*, 577 F. Supp.3d at 354 (quoting *Bodden v. Colvin*, No. 14-CV-8731, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015)); *see also Flynn v. Commissioner of Social Security Administration*, 729 F. App'x 119, 122 (2d Cir. 2018) (explaining that mental health impairments are "not susceptible to clear records such as x-rays or MRIs" and instead depend "almost exclusively" on "less discretely

measurable factors, like what the patient says in consultations").  As a result, the courts are appropriately wary of opinions from sources "where … a one-time snapshot of a claimant's status may not be indicative of [their] longitudinal mental health."  *Estrella*, 825 F.3d at 98 (2d Cir. 2019).

Even so, "where there are no obvious gaps in the record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez*, 77 F.3d at 48); *see Colombia B.N. v. Commissioner of Social Security*, No. 21-CV-10622, 2023 WL 358599, at *3 (S.D.N.Y. Jan. 23, 2023) ("The absence, however, of a medical source statement from a treating physician does not warrant remand if 'the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity'") (quoting *Tankisi*, 521 F. App'x at 33-34).

## 2.    Remand Is Not Warranted

On the facts of this case, the ALJ had a sufficient record on which to make his determination, even without an assessment of Plaintiff's functional limitations from a treating provider.

The ALJ solicited, received, reviewed, and extensively cited to a lengthy medical record that included longitudinal mental health treatment notes dating back to 2012 and back and neck treatment notes dating back to 2017.  The ALJ also considered opinions from consultative examiners Drs. Mercurio and Tsoubris, along with four non-examining PAMFs who reviewed the entire record through September 2020 for physical impairments (R. 113) and December 2020 for mental impairments (R. 109).  Pursuant to the regulations, the ALJ did "not defer or give any specific evidentiary weight, including

controlling weight, to any prior administrative medical findings or medical opinions," instead evaluating each, as the regulations require, on their own merits. (*See* R. 21.)  In so doing, the ALJ found the PAMFs' (Drs. Putcha and Mohanty's) opinions on Edwards' capacity to perform light exertion persuasive and Dr. Mercurio's more restricted opinion only partially persuasive because of his use of vague terminology. (R. 21.)  Regarding Edwards' mental impairments, the ALJ found Dr. Tsoubris' opinion unpersuasive because it was inconsistent with the treatment records and Edwards' own testimony on his ability to engage in certain activities of daily life, and the PAMFs' (Drs. Sherer and Hoffman's) opinions persuasive "only to the extent of finding no marked limitations" because "the evidence does support more than mild limitations." (R. 21-22.)

Edwards argues that "[w]ithout an opinion explaining how the raw treatment records affect the claimant's RFC, an ALJ has no substantial evidence on which to base an RFC determination." (Pl. Mem. at 17.)  But the ALJ did have that opinion evidence. For example, the ALJ found persuasive Drs. Putcha and Mohanty's conclusion that Edwards could perform light exertion as supported by both record evidence of his minimal treatment and Dr. Mercurio's findings of normal range of motion outside of limited lumbar spine flexion and bilateral shoulder elevation and abduction. (R. 21.)  The ALJ also partially relied on Dr. Mercurio's conclusion of mild and moderate limitations in light of examination findings of normal gait and strength and no neurological deficits. (R. 21.) Similarly, regarding Edwards' mental impairments, the ALJ relied on Drs. Sherer and Hoffman's findings of no marked limitations, given the Synergy treatment notes showing, inter alia, stable anxiety and depression, normal impulse control, and grossly intact insight and judgment. (R. 21-22.)

That the ALJ did not base his determination on the opinions of any single opinion sources, and did not find any one opinion fully persuasive, is of no moment.  *See Corbiere v. Berryhill*, 760 F. App'x 54, 56 (2d Cir. 2019) (affirming ALJ's RFC assessment based on objective medical evidence after rejecting in part the opinions of both treating and non-examining sources); *Monroe v. Commissioner of Social Security*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (affirming where ALJ rejected sole medical opinion concerning mental functioning); *Pellam v. Astrue*, 508 F. App'x 87, 89-91 (2d Cir. 2013) (affirming ALJ's RFC formulation where ALJ relied on treatment and examining records while rejecting large portions of the sole one consultative examining physician's opinion that was otherwise inconsistent with the ALJ's RFC formulation).

According to Edwards, the ALJ improperly relied on the state agency opinions because they were stale, in that they were "rendered early in the disability review process," "reached … conclusions on the basis of an incomplete record," and "d[id] not account for [Edwards'] deteriorating condition."  (Pl. Mem. at 16-17; *see also* R. 21.)  Each of these critiques fail.

As a threshold matter, and, as both parties agree, the opinions of consultative examiners and state agency non-examining consultative physicians can constitute substantial evidence in support of the ALJ's decision.  (*See* Def. Mem. at 19; Pl. Reply at 6.)  The Social Security Regulations describe non-examining state agency consultants as "highly qualified and experts in Social Security disability," and their opinions constitute substantial evidence where, as here, they are consistent with other medical evidence of record.  *See* 20 C.F.R. § 404.1513a(b)(1); *see also Diaz v. Shalala*, 59 F.3d 307, 212 n.5 (2d Cir. 1995) (stating that the regulations "permit the opinions of nonexamining treating

sources to override treating sources' opinions provided that they are supported by evidence in the record"); *Ronald S. v. Commissioner of Social Security*, No. 20-CV-1688, 2022 WL 3716568, at *18 (W.D.N.Y. Aug. 29, 2022) ("Contrary to Plaintiff's suggestion that [the state agency examiner's] opinion could not constitute substantial evidence because he did not examine Plaintiff …, state agency medical consultants are highly qualified and experts in Social Security disability evaluation, and their prior administrative findings must be considered").

Moreover, under the revised regulations, the governing criteria in determining the persuasiveness of a medical source opinion are not the relationship between the medical source and claimant, but rather the opinion's supportability and consistency.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at 5853, 5857-58 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c(b)(2)-(3), (c)(1)-(2).  The ALJ here properly analyzed those factors.  The ALJ found that the PAMFs' opinion that Edwards could lift and carry 20 pounds occasionally but ten pounds frequently; stand, walk, or sit for six hours; and push and/or pull consistent with the lifting and carrying requirements was "well supported by the medical evidence and consistent with results of physical examinations [and] his minimal treatment," citing findings of full strength of the upper and lower extremities, no sensory defects, and normal range of motion in Edwards' back and neck except for both limited flexion of the lumbar spine and elevation and bilateral shoulder elevation and abduction.  (R. 21.)  However, "[g]iven [Edwards'] subjective complaints," the RFC also "accounted for additional posturing and reaching limitations."  (R. 21.)  For Edwards' mental impairments, the ALJ explicitly stated that the PAMFs' opinions were persuasive "only to the extent of finding no marked limitations," while rejecting the PAMFs' opinions that Edwards had no

limitations in mental functioning because "the evidence does support more than mild limitations." (R. 21-22.) In short, the ALJ applied the correct standards and sufficiently explained his positions in assessing to what degree to credit the PAMFs' opinions.

Edwards' argument that the PAMFs' opinions were stale does not stand up to scrutiny. First, the PAMFs' opinions were not provided early in the disability review process. Drs. Putcha and Sherer rendered their opinions on October 28 and 29, 2020, respectively, about nine months prior to the July 2021 hearing. (R. 92, 95.) Dr. Hoffman's opinion upon reconsideration was decided on February 23, 2021 and Dr. Mohanty's on March 23, 2021, respectively five and four months before the hearing. (R. 109, 114.)

Additionally, while there are treatment notes in the record that post-date the PAMFs' opinions, a "medical opinion is [not] stale merely because it pre-dates other evidence in the record." *Rodriguez v. Kijakazi*, No. 21-CV-2358, 2022 WL 3211684, at *15 (S.D.N.Y. Aug. 9, 2022). Rather "a medical opinion may be stale if subsequent treatment notes indicate a claimant's condition has deteriorated." *Whitehurst v. Berryhill*, No. 16-CV-1005, 2018 WL 3868721, at *4 (W.D.N.Y. Aug. 14, 2019). For this analysis, "[t]he relevant issue is whether plaintiff's condition *deteriorated* during th[e] period [at issue]," i.e., the time between when the medical opinions were rendered and when the ALJ made their determination. *Villalobo v. Saul*, No. 19-CV-11560, 2021 WL 830034, at *19 (S.D.N.Y. Feb. 9, 2021) (internal quotation marks omitted) (emphasis in original). It is not enough to show "lack of improvement"; … "the record must show a deterioration in Plaintiff's condition for which the opinion at issue could not have accounted." *Mohsin A. v. Commissioner of Social Security*, No. 20-CV-1502, 2022 WL 94557, at *6 (W.D.N.Y. Jan. 10, 2022).

Edwards asserts in conclusory fashion that the PAMFs' opinions did not consider his deteriorating condition but fails to point to any evidence showing that either his mental or his physical health significantly deteriorated in the intervening period.  (*See* Pl. Mem. at 17.)   The reconsideration opinions of Drs. Hoffman and Mohanty were based on a review of the record that included additional treatment records from appointments that occurred up until December 2020, seven months prior to the ALJ's date of decision.  (R. 109.)  Examination of the post-opinion treatment records not considered by the PAMFs – i.e., those records for treatment provided between December 2020 and July 2021 – reveals no evidence that Edwards' condition deteriorated.  Dr. Panzarino and Leontay's treatment notes for the period after the PAMFs opinions resemble those before, with consistent evaluations of normal, appropriate, and unremarkable findings.  (*Compare, e.g.*, R. 1738 (July 2019 Synergy appointment finding cooperative and appropriate behavior, clear and appropriate thought process, intact associative thinking, memory, and judgment and insight, and normal impulse control and attention span and concentration), 1750 (October 2019 Synergy appointment finding same), and 1772 (July 2020 Synergy appointment finding same), *with* R. 1902 (February 2021 Synergy appointment finding same), 1906 (March 2021 Synergy appointment finding same), and 1912 (May 2021 Synergy appointment finding same)).   The same is true for records from Crystal Run (*Compare, e.g.*, R. 1203-07 (March 2019 Crystal Run appointment finding lumbosacral and cervical spine pain and diagnosing Edwards with cervical and bilateral lumbar radiculopathy) and 1183-87 (December 2019 Crystal Run appointment finding same), *with* R. 1198-1201 (May 2020 Crystal Run appointment finding neck pain, muscle spasms in cervical and lumbar spine, and mild pain with range of motion, diagnosing Edwards

with cervical and bilateral lumbar radiculopathy), and R. 1831-1833 (May 2021 Crystal Run appointment finding same)).

Edwards argues not only that the PAMFs' opinions are stale and incomplete, but so was the record insofar as related to his physical impairments.  He contends that "the ALJ had no timely evidence of current treatment of Plaintiff's back upon which to make an RFC determination" since Edwards "has not received specific treatment for his back since 2019[], when Workers' Compensation determined he had reached maximum medical improvement. " (Pl. Mem. at 15.)  Edwards' representation of the record is incorrect.  Although Workers' Compensation treatment and payments ceased in 2019, the record reviewed by the ALJ includes Crystal Run treatment records related to Edwards' physical health, including physical examination results from 2020 and 2021, none of which contradicted prior findings.  (*See* R. 1198-1202, 1818-24, 1831-35.)  And the record included the PAMFs' opinions, Dr. Mercurio's examination results, and Plaintiff's own statements in questionnaires and testimony and was, as Edwards' counsel represented at the hearing, "complete."  (*See* R. 60.)  *See Mangual v. Commissioner of Society Security*, 600 F. Supp.3d 313, 326 ("because Mangual's counsel represented to the ALJ that the record was complete, we discern no error in the ALJ's development of the record").

Courts have remanded in cases where, absent a treating source opinion, an ALJ failed to provide an adequate explanation for their decision, relied on stale medical opinions or an incomplete or ambiguous record, or the underlying treatment record

suggested much more significant limitations than opined.[9]  But "[r]emand is not warranted in cases, as here, where the ALJ obtained the relevant treatment records, undertook a 'longitudinal review of the objective record evidence,' and reasonably reconciled the medical opinion evidence."  *Colombia B.N.*, 2023 WL 358599, at *4 (citing *Grattan v. Commissioner of Society Security*, No. 18-CV-808, 2020 WL 1514780, at *5 (W.D.N.Y. March 30, 2020); *see also Wayne Kenneth R. v. Commissioner of Social Security*, No. 21-CV-1341, 2022 WL 4537909, at *7 (S.D.N.Y. July 4, 2022), *R & R adopted sub nom*, *Reed v. Commissioner of Social Security*, No. 21-CV-1341, 2022 WL 4538942 (S.D.N.Y. Sept. 28, 2022) (finding that the absence of a treating source opinion did not require

---

[9] *See e.g. Russ v. Commissioner of Social Security*, 582 F. Supp.3d 151, 164-66 (S.D.N.Y. 2022) (remanding for failure to develop the record where ALJ relied on the opinion of a non-examining consulting doctor who did not review claimant's record for a period of nearly a year during which records showed at least fourteen doctors' visits, the records of which reflected that claimants pain was exacerbated.  "[T]hus had no opinion from any medical source, treating or otherwise, as to the significance of the additional records or their implication for [claimant's] functional abilities" and it was, therefore, "'fundamentally unfair' for the ALJ to rely on the absence of an opinion contradicting the consulting doctors or supporting [claimant's] complaints while substituting his own opinion with respect to a significant and lengthy period of the medical record on which no doctor opined*); Blair v.* Colvin, No. 16-CV-5983, 2017 WL 4339481, at *5 (S.D.N.Y. May 15, 2018), *R & R* adopted, 2017 WL 4342123 (S.D.N.Y. Sept. 27, 2017) ("It is fundamentally unfair for the ALJ not to develop the record by obtaining treating sources' opinions while at the same time basing his disability determination, inter alia, on the ground that 'the record does not contain any non-conclusory opinions, supported by clinical or laboratory evidence, from treating or examining physicians indicating that the claimant is currently disabled") (original emphasis omitted); *Lecler v. Barnhart*, No. 01-CV-8659, 2002 WL 31548600, at *6 (S.D.N.Y. Nov. 14, 2002) ("The ALJ, in his rationale and findings, made no reference to Dr. Rosenberg's report even though it was the only medical evidence that spoke directly to Lecler's exertional capabilities"); *Geoghan v. Commissioner of Social Security*, No. 20-CV-2840, 2022 WL 118723, at *3-4 (E.D.N.Y. Jan. 12, 2022) (remanding where no treating physician testified or offered opinion evidence and there was a "near-total absence of medical evidence supporting the ALJ's RFC finding"); *Hernandez v. Commissioner of Social Security*, No. 20-CV-5760, 2022 WL 604005, at *4 (E.D.N.Y. March 1, 2022) (remanding because of inconsistent record and lack of treating source opinion).

remand since "the record contains extensive treatment records spanning several years including clinical examination findings, imaging studies, and treatment notes, along with opinions from a consultative examiner and State Agency review physicians"); *Prince v. Colvin*, No. 13-CV-7666, 2015 WL 1408411, at *17 (S.D.N.Y. March 27, 2015) ("Because the record before [the ALJ] contained detailed medical records from Prince's treatment with [his treating physician], [the ALJ] was not required to obtain a medical source statement from [the treating physician]").

**B.   The RFC Is Supported By Substantial Evidence And The ALJ Adequately Analyzed Dr. Tsoubris' Opinion**

Edwards argues that the ALJ's RFC determination was not based on substantial evidence.   First, Edwards asserts that the ALJ improperly evaluated his mental impairments and, specifically, the opinion of Dr. Tsoubris.  (Pl. Mem. 19-23.)  Second, Edwards alleges that the ALJ failed to explain inconsistencies in the record for his physical impairments.  (Pl. Mem. 17-18.)  Both arguments fail.

**1.    Edwards' Mental Impairments**

The ALJ assessed that Edwards had an RFC for light work and that he is able to understand, remember, and carry out simple and routine tasks with regular breaks at two-hour intervals, with decision making and changes in work setting related to simple and routine tasks, and brief and superficial interaction with coworkers and supervisors without tandem tasks.  (R. 16-17.)  The ALJ grounded that determination on substantial evidence, including the medical record, opinion evidence, and Edwards' testimony.

Edwards nevertheless asserts that the ALJ erroneously "failed to discuss [Edwards'] diagnoses as of 2020 which included anxiety and personality disorders, both unspecified."  (Pl. Mem. at 18-19.)  The ALJ, however, repeatedly discussed Edwards'

anxiety, depression, and other impairments, including Edwards' intermittent explosive disorder, acknowledging both positive results (suggesting limitations) and negative results (indicating normal functioning).  (R. 14-22.)  Among other evidence, the ALJ noted that Dr. Panzarino assessed Edwards' depression and anxiety to be stable as of March 2020 despite ongoing situational stressors (R. 20, *see also* 1144), as well as the PAMFs' opinions that Edwards had no marked limitations in the paragraph B criteria (R. 21-22, *see also* 91, 108).  Moreover, the RFC formulation accounts for Edwards' moderate limitation in interacting with others by limiting his RFC to only "brief and superficial interaction with coworkers and supervisors."  (R. 17.)  Likewise, the ALJ accounted for Edwards' mild limitation in understanding, remembering, or applying information and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting and managing oneself by limiting Edwards' RFC to simple and routine tasks with regular breaks at two-hour intervals.  (R. 16-17.)

In determining Edwards' RFC, the ALJ found the opinion of Dr. Tsoubris unpersuasive.  (R. 22.)  In part that was because Dr. Tsoubris' examined Edwards only once and thus did not have a longitudinal perspective.  But the ALJ also found Dr. Tsoubris' opinion unpersuasive because it was inconsistent internally and with other evidence of record.  In particular, the ALJ found Dr. Tsoubris' opinion that Edwards has marked limitations in his ability to interact adequately with supervisors, coworkers, and the public inconsistent with treatment records, such as those showing normal impulse control, as well as Edwards' reported activities of daily living, including being in a relationship, being able to shop and drive locally, and attend events like parent teach

conferences.[10]   (R. 15, 16, 22, *see* 1604-05, 1758.)   And, although not specifically mentioned by the ALJ, there are additional inconsistencies that support his assessment. For example, Dr. Tsoubris' opinion that Edwards had moderate limitations in his ability to maintain personal hygiene and appropriate attire is contradicted by Edwards' reports to Dr. Tsoubris that he can "dress, bathe, and groom himself … [do] laundry" and "some cleaning with help."  (*See* R. 1604.)  Thus, contrary to Edwards' suggestion, "[t]he ALJ did not impermissibly substitute [his] own expertise for [Dr. Tsoubris'] opinion, but rather [he] rejected [Dr. Tsoubris'] opinion because [he] found it was contrary to the record." *Rucker v. Kijakazi*, 48 F.4th 86, 95 (2d Cir. 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).)

Nor did the ALJ impermissibly cherry-pick from Dr. Tsoubris' findings.  (*See* Pl. Mem. at 22.)  To the contrary, the ALJ discussed both Dr. Tsoubris' positive findings and negative findings.  (R. 15-16, 20.)  But the ALJ also considered those findings in the context of the longitudinal medical record of Edwards' mental health, which consistently identified cooperative behavior, intact judgment and insight, and normal impulse control both prior to and after Tsoubris gave his opinion.  (*See* R. 1422, 1424, 1426, 1429, 1432, 1434, 1436, 1438, 1440, 1442, 1446, 1448, 1450, 1452, 1454, 1456, 1460, 1462, 1464, 1466, 1468, 1470, 1472, 1900, 1902, 1904, 1908, 1910, 1912, 1914, 1916, 1918.) Having found that Dr. Tsoubris' opinion was not consistent with his own findings or the record as

---

[10] The ALJ also cited as an inconsistency Dr. Tsoubris' findings on examination of "intact attention/concentration and memory."  (R. 22.)  Yet, at the same time, the ALJ recited that Dr. Tsoubris found "no evidence of limitation in the claimant's ability to sustain concentration."  (*Id.*)  To the extent the ALJ erred in finding an inconsistency where there was none, it is harmless given the other inconsistencies of record and the remainder of the ALJ's reasoning in regard to Dr. Tsoubris' opinion.

a whole, the ALJ reasonably assessed the opinion as unpersuasive.  *See* 20 C.F.R. §

404.1520c(c)(2) (stating that ALJs will consider the consistency of a medical opinion and

"[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is

with the evidence from [the rest of the record], the more persuasive [it] will be"); *Garcia v.*

*Kijakazi*, No. 21-CV-1895, 2022 WL 3442314, at *17 (S.D.N.Y. Aug. 11, 2022), *R & R*

*adopted*, 2022 WL 3903182 (S.D.N.Y. Aug. 30, 2022) (discrediting doctor's findings

where they were unsupported by the longitudinal treatment records of claimant's mental

impairments); *Young v. Kijakazi*, No. 20-CV-3604, 2021 WL 4148733, at *10-11 (S.D.N.Y.

Sept. 13, 2021) (finding no error in assessing consistency when ALJ explained

inconsistencies among medical opinions and other parts of the record).

Edwards cites parts of his subjective testimony as well as his reported symptoms

as evidence that the ALJ erred in analyzing Dr. Tsoubris' opinion.  (*See* Pl. Mem. at 18

(citing, inter alia, R. 75-76 (Edwards' testifying to rages and associated loss of

concentration, depression, and anxiety), 1604 (Edwards reporting to Dr. Tsoubris that he

can launder, go shopping, and clean only with help, and that he does not manage money,

take public transportation, or socialize)).   The ALJ, however, did consider Edwards'

testimony and reports about his symptoms, including that Edwards reported feeling that

everyone is against him, episodes of rage, side effects from medication, palpitations,

depersonalization, paranoid ideation, and various anxiety triggers.  (R. 19-20.) Of course,

the ALJ also considered the other aspects of Edwards' testimony and reports of his

symptoms (such as that Edwards was dating, was independent with personal care, could

do household chores with help, could care for his young children, and could attend parent-

teacher conferences, drive locally, and shop) (R. 16, *see also* 65-69), together with the

entire medical record.  Regardless, the ALJ is permitted to assess the credibility of a claimant's testimony against the record and to resolve inconsistencies.  *See Carroll v. Secretary of Health & Human Services,* 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the [Commissioner] … to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant").

In sum, substantial evidence supports the ALJ's RFC determination as well as the ALJ's assessment of Dr. Tsoubris' opinion.  Even though there is evidence to also support a contrary view, this Court cannot consider the issue de novo, and must uphold the Commissioner's decision.  *Genier*, 606 F.3d at 49; *see also Jones*, 949 F.2d at 59 ("The court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review") (internal quotation marks and citation omitted).

### 2.    Edwards' Physical Impairments

The ALJ concluded that Edwards had the RFC to perform light work except with occasional balancing, stooping, kneeling, crouching, crawling, and use of ramps and stairs; no ladders, ropes, or scaffolds; and frequent reaching.  (R. 16-17.)  In arriving at this RFC, the ALJ appropriately considered the entire medical record, opinion evidence, and Edwards' testimony, and acknowledged both positive and negative findings.  The ALJ stated that Edwards' "cervical and lumbar impairments do result in some degree of functional limitation" and that there were some abnormalities detected in the treating source records, citing Edwards' history of a work injury; diagnoses of low back pain and radiculopathy; 2018 imaging results showing degenerative changes of the cervical and lumbar spine; and findings of muscle spasms, moderate pain and decreased range of motion of the cervical and lumbar spine, antalgic gait, and positive leg raising test

memorialized in various Crystal Run records (R. 17-19, *see* 359-66, 651-669, 1181-82, 1193, 1832, 1834.)

At the same time, the ALJ balanced those findings with treatment records from the relevant period, which showed that Edwards' functional limitations were not as severe as alleged.  Although the treatment records include some decrease in range of motion and pain in the spine, Edwards otherwise has no sensory deficits, intact overall neurological functioning, normal sensation and deep tendon reflexes, and normal strength.  (R. 18-20; *see also* 1180-1192, 1293-96, 1831-33.)  Imaging of the lumbar and cervical spine did not show any significant or acute osseous abnormalities and certain other tests were negative.  (R. 18-19, *see also* 1295-98.)  While Edwards had limited forward elevation and abduction of both shoulders, he had full range of motion in his hips, knees, and ankles, full strength in his upper and lower extremities, full bilateral grip strength, and intact hand and finger dexterity.  (R. 18-19, *see also* 1295.)  The ALJ also considered, as required, Edwards' obesity.  (R. 19, *see* SSR 19-2p, 84 Fed. Reg. 22924 (May 20, 2019).)  Although the record includes a treatment note from Dr. Fekete recommending that Edwards lose weight (R. 1233), it does not "document any significant problems secondary to obesity" and, thus, the ALJ found no reason to further reduce Edwards' RFC (R. 19).

The ALJ also discussed the opinion evidence in the record.  The ALJ found the PAMFs opinions that Edwards could perform light exertion persuasive as justified by the medical record, which generally showed the Edwards had normal range of motion, full strength, and no sensory deficits.  (R. 21, *see* 1180-82, 1293-96, 1831-33.)  The ALJ also discussed consultative examiner Dr. Mercurio's findings and conclusions in assessing the physical RFC.  On examination, Dr. Mercurio found Edwards to have certain limitations

but to be otherwise largely functional.  For example, Edwards had full range of motion of his hips, knees, and ankles, as well as full strength in his upper and lower extremities, full grip strength bilaterally, and intact hand and finger dexterity.  (R. 18-19, *see* 1295.)  Dr. Mercurio also found that Edwards had a normal gait, normal movements in the cervical and lumbar spine except flexion of the lumbar spine was limited to 75 degrees and forward elevation of abduction of both shoulders was limited to 130 degrees.  (R. 18, *see* 1294-95.)  Dr. Mercurio assessed mild limitations for prolonged standing, walking, climbing stairs, and reaching, and moderate limitations for repetitive bending, lifting, carrying, kneeling, and overhead reaching.  (R. 21.)

Edwards asserts that Dr Mercurio's opinion was deficient as he "did not opine as to how long Plaintiff can sit, stand, or walk during an 8-hour workday, nor whether and to what extent he could push or pull and how much weight he could lift and carry."  (Pl. Mem. at 15.)  Although the ALJ acknowledged the terms "mild" and "moderate" were not well defined, he found that they did not imply that Edwards is precluded from all work-related activity.  (R. 21.)  "[T]aken together" with the normal results from other examination findings, "minimal treatment since the alleged onset date[,] and the opinion of the [PAMFs]," the ALJ determined that Dr. Mercurio's opinion supported an RFC for light work.  (R. 21.)  *See White v. Berryhill*, 753 F. App'x 80, 82 (2d Cir. 2019) (finding ALJ's inference that claimant was able to perform light work from a physician's opinion that claimant had "'moderate limitations' in standing, sitting, and performing other activities" proper where ALJ's determination was supported by other record evidence); *Johnson v. Colvin*, 669 F. App'x 44, 46 (2d Cir. 2016) ("[w]hile [the medical source opinion] alone might be inadequate to support the ALJ's finding, the conclusion that [claimant] was

capable of performing light work was supported by the other record evidence the ALJ considered").

In faulting the ALJ, Edwards emphasizes his own testimony about his limitations, asserting that they contradict some of Dr. Mercurio's findings and require developing the record further.  (Pl. Mem. at 15-16.)  However, the ALJ expressly considered Edwards' testimony and, while crediting it to some degree, found that it was not fully consistent with the record.  (R. 17-21.)  For example, the ALJ considered Edwards' hearing testimony that he can only walk for about ten minutes and sit for about ten to twenty minutes; his most comfortable position is lying down; he lies down at least once a day; and three to four times a week he lies down two to three times a day for about an hour.  (R. 17.)  While recognizing that the objective evidence supported the conclusion that Edwards' back and neck impairments would reasonably result in some functional limitations and that "the medical record supports some of [Edwards'] allegations," the ALJ found that the record did "not demonstrate the frequency of the limitations [Edwards] claimed," citing examination findings of no sensory deficits, normal sensation and deep tendon reflexes, overall intact neurological functioning, minimal decreases in spine range of motion, full grip strength, and no acute osseous abnormality in either the lumbar or cervical spine.[11] (R. 18-19.)

The rules permit an ALJ to discount a claimant's subjective complaints in precisely such circumstances.  20 C.F.R. § 404.1529(a) ("We will consider your statements about

---

[11] Similarly, the ALJ recited Edwards' hearing testimony that he experienced episodes of rage, his symptoms of anxiety and depression that follow, and that he feels that everyone is against him, but found those statements to be inconsistent with treatment notes, such as those showing good impulse control, insight, and judgment.  (R. 16, 20.)

the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled.  We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence"); *see, e.g.*, *Genier*, 606 F.3d at 49 ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account …, but is not required to accept the claimant's subject complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record"); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) ("The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged by the claimant"); *Martes v. Commissioner of Social Security*, 344 F. Supp.3d 750, 763 (S.D.N.Y. 2018) ("an ALJ 'is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record'") (citing *Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015)).

Edwards' assertion that the ALJ failed to explain inconsistencies in the medical record is also unconvincing.  (Pl. Mem. 17-18.)  Again, Edwards makes only a conclusory allegation with no support.  Edwards has not specified how Dr. Mercurio's and the PAMFs' opinions are inconsistent and the Court does not discern any inconsistencies.  Both Drs. Putcha and Mohanty relied on and discussed Dr. Mercurio's findings in their assessments.  (R. 93-95, 111-14.)  And neither considered those limitations opined by

Dr. Mercurio to be more restrictive than their own limitations.  In fact, as the Commissioner notes, both Drs. Putcha and Mohanty stated that no medical opinions they assessed – including Dr. Mercurio's – were more restrictive than their findings.  (Def. Mem. at 20; *see also* R. 95, 114.)

Indeed, all the medical opinion evidence comports with a range of light work.  The PAMFs explicitly stated that Edwards was capable of light work (*see* R. 95, 115), and Dr. Mercurio's opinion of mild limitations for prolonged standing, walking, climbing stairs, or reaching and moderate limitations for repetitive bending, lifting, carrying, kneeling, and overhead reaching, constitute a proper basis from which to infer the capacity to perform light work (R. 1296).  *See White*, 753 F. App'x at 82 (finding ALJ properly inferred claimant could perform light work from physician's opinion that claimant had "moderate limitations" in standing, sitting, and performing other activities).  The ALJ's determination of Edwards' physical RFC thus is supported by the evidence and opinions of record.

## C.    The ALJ Did Not Err At Step Five

Edwards argues that the ALJ erred at Step Five by finding that there are a significant number of jobs in the national economy that he could perform.[12]  That argument has no merit.

The regulations provide no threshold or criteria for what number of jobs in the national economy constitute significant numbers.  Nor has the Second Circuit set any bright line rule regarding the number of jobs needed to satisfy the Commissioner's burden

---

[12] Edwards additionally asserts that the ALJ's hypothetical to the VE was unsupported by substantial evidence.  (Pl. Mem. at 19-20.)  That argument fails because the Court has found that substantial evidence supports the RFC determination, which was the basis for the hypothetical.

at step five.  Courts in this and other districts within the Second Circuit nonetheless "'have generally found that what constitutes a "significant" number is fairly minimal.'"  *Rodriguez v. Astrue*, No. 11-CV-6977, 2013 WL 3753411, at *3 (S.D.N.Y. July 17, 2013) (quoting *Fox v. Commissioner of Social Security*, No. 02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009) (collecting cases)).  Courts thus have found varying nationwide numbers upwards of 9,000 jobs sufficient to meet the significant number requirement. *See*, *e.g.*, *Valdes v. Commissioner of Social Security*, No. 21-CV-914, 2022 WL 20380997, at *13 (S.D.N.Y. Aug. 11, 2022), *R & R adopted*, 2023 WL 4625524 (S.D.N.Y. July 18, 2023) (combined total of 13,000 jobs was significant); *Kelly D. v. Saul*, No. 18-CV-1190, 2019 WL 6683542, at *6 (N.D.N.Y. Dec. 6, 2019) (9,996 jobs nationwide was significant); *Debiase v. Commissioner of Social Security*, No. 3:19-CV-68, 2019 WL 5485269, at *12 (D. Conn. Oct. 25, 2019) (11,442 jobs nationwide deemed significant); *Sanchez v. Berryhill*, 336 F. Supp.3d 174, 178 (W.D.N.Y. 2018) (9,046 jobs nationwide was, consistent with other courts, significant); *Rodriguez v. Astrue*, 2013 WL 3753411 at *2-3 (12,000 jobs nationwide was significant).

At hearings, VEs typically identify three different types of jobs that may be performed by someone with the claimant's RFC.  But to find a claimant not disabled, no particular number of positions need be identified; so long as a position exists in sufficiently significant numbers, "[t]he Commissioner need show only one job existing in the national economy that [the claimant] can perform."  *Bavara v. Astrue,* 413 F. App'x 382, 384 (2d Cir. 2011) (citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b)).  Here, the ALJ found that Edwards had the RFC to be a garment sorter, of which there are more than 222,000

positions according to the Dictionary of Occupational Titles.  (R. 23.)  That number well exceeds the "significant" threshold.

Edwards cites to *Lounsburry v. Barnhart*, 468 F.3d 1111, 1115 (9th Cir. 2006) for the proposition that one occupation does not constitute a significant range of work under 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.00(c).  (Pl. Mem. at 20.) "*Lounsburry* is inapposite, however, because it was dictated by the statutory language that applies only to 'individuals of advanced age,'" i.e., individuals over 49, whereas Edwards was forty at the time of the alleged disability onset.  *Wazeter v. Commissioner of Social Security*, No. 8-CV-479, 2009 WL 2032076, at *7 (S.D.N.Y. July 6, 2009) (quoting 20 C.F.R. Part 404, Subpart P, Appendix 2, Rules 200.00 and 202.00(c)); *see also DeJesus v. Barnhart*, No. 6-CV-6044, 2007 WL 528895, at *13 n.6 (W.D.N.Y. Feb. 13, 2007) (stating that *Lounsburry* rule "referring to 'individuals of advanced age,' does not apply to plaintiff, who, at age 34, is a 'younger individual'").

The Commissioner thus has met its burden to demonstrate the existence of a significant number of available jobs in the national economy.

## CONCLUSION

Accordingly, pursuant to sentence four of 42 U.S.C. § 405(g), Edward's motion is DENIED.  The Clerk of Court is directed to enter Judgment in favor of the Defendant and to close the case.

SO ORDERED.

_____

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: September 22, 2023
       New York, New York

Copies transmitted on this date to all counsel of record.